# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| NICOLLET CATTLE COMPANY, INC., d/b/a Horizon International, | Civil No. 08-5899 (JRT/FLN) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER DENYING MOTION TO DISMISS** |
| v. | |
| UNITED FOOD GROUP, LLC, | |
| Defendant. | |

Charles N. Nauen, David J. Zoll, and William A. Gengler, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401, for plaintiff.

Mary R. Vasaly and Laurence J. Reszetar, **MASLON EDELMAN BORMAN & BRAND, LLP**, 90 South Seventh Street, Suite 3300, Minneapolis, MN 55402, for defendant.

Plaintiff Nicollet Cattle Company, a company based in Minnesota which does business under the name Horizon International ("Horizon"), sells beef, lamb, and mutton products originating from several continents. Defendant United Food Group, LLC ("UFG"), a company based in California, is one of Horizon's customers, and placed orders with Horizon worth at least $15.2 million from 2007 to 2008. After UFG cancelled 127 sales contracts worth more than $9 million in October 2008, Horizon filed this action against UFG alleging three contract claims under the Uniform Commercial Code ("UCC"). UFG now moves to dismiss the case for lack of personal jurisdiction and

improper venue, or, in the alternative, to transfer the case to the Central District of California. For the reasons given below, UFG's motion is denied.

**BACKGROUND**

Horizon is a Minnesota corporation that sells beef, lamb, and mutton products from Australia, New Zealand, Uruguay, the United States, and Canada. (Goldberger Decl., Docket No. 16, ¶ 2.) Horizon sells these products to importers, traders, distributors, and processors throughout the United States. (*Id.*, ¶ 3.)

Following a meeting between representatives of Horizon and UFG at a trade show in California, Horizon began selling meat products to UFG in June 2005. (Karp Decl., Docket No. 9, ¶ 9; Goldberger Decl., Docket No. 16, ¶ 8.) In 2005, UFG made 70 separate purchases from Horizon totaling more than $3 million worth of meat, in 2006 UFG made 158 separate purchases totaling nearly $8 million, and in 2007 UFG made 72 separate purchases totaling nearly $4 million. (Goldberger Decl., Docket No. 16, ¶¶ 9-11.) After a meeting in California in 2007 the parties decided to expand their relationship, and in 2008, UFG made 230 separate purchases from Horizon totaling more than $12 million. (*Id.*, ¶¶ 12-13.)

Negotiations during the course of this extensive business relationship were routed primarily through Stewart-Miller, Inc. ("Stewart-Miller"), a broker in Illinois. (Karp Decl., Docket No. 9, ¶ 7.) Stewart-Miller acts as an agent for meat suppliers and handled certain aspects of the parties' negotiations on Horizon's behalf, including questions of price and quantity. (*Id.*) Invoices and payments, however, were sent directly between the

parties. (Goldberger Decl., Docket No. 16, ¶ 25-26.) Horizon also indicates that there were "numerous direct communications between UFG and Horizon throughout the relationship by phone and e-mail." (*Id*., ¶ 27.) Horizon notes, in particular, that there were more than 700 emails sent by UFG agents to Horizon between mid-2005 and December 2008, related to orders, delivery dates, and new business prospects. (*Id.*) Horizon further indicates that it frequently made sale offers directly to UFG, and that the parties often were able to consummate deals on their own.[1] (*Id*., ¶ 28.)

Following a precipitous drop in prices for imported beef products, on October 30, 2008, UFG cancelled 127 outstanding contracts with Horizon. (*Id.*, ¶¶ 42, 43.) UFG alleges that this cancellation resulted from paperwork errors related to a required certification that the imported meat was not contaminated with *e. coli*. (*Id*., ¶¶ 38-42.) Horizon responds that the paperwork issues were not unusual in the industry, not caused by Horizon, and remedied within 24 hours. (*Id*., ¶¶ 40-41.) Horizon also contends that it mitigated its damages by selling the meat elsewhere and that on at least two occasions it sold the meat to wholesalers who resold the meat to UFG at significantly lower prices than those originally agreed to by UFG and Horizon. (*Id.*, ¶ 47.)

Horizon brought this lawsuit on November 3, 2008, alleging three contract claims under the UCC (as adopted in Minnesota). In sum, Horizon contends that UFG improperly repudiated 127 valid sales contracts, and seeks damages for its losses. UFG now moves to dismiss the complaint, arguing that this Court lacks personal jurisdiction

---

[1] UFG notes that none of the contracts at issue in this case were negotiated directly. (Karp Decl., Docket No. 21, ¶ 8.)

over UFG and that the District of Minnesota is an improper venue. In the alternative, UFG asks that this case be transferred to the Central District of California.

## ANALYSIS

### I. PERSONAL JURISDICTION

"A federal court in a diversity action may assume jurisdiction over nonresident defendants only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause." *Dever v. Hentzen Coatings, Inc*, 380 F.3d 1070, 1073 (8th Cir. 2004) (internal quotation marks omitted). Because the long-arm statute of Minnesota confers jurisdiction to the fullest constitutional extent, *see Valspar Corp. v. Lukken Color Corp*., 495 N.W.2d 408, 411 (Minn. 1992), the Court's inquiry is limited to whether an exercise of personal jurisdiction in this case would comport with due process.

"Due process requires minimum contacts between a non-resident defendant and the forum state such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Dever*, 380 F.3d at 1073 (internal quotation marks omitted). "The Supreme Court has set forth two theories for evaluating minimum contacts, general jurisdiction and specific jurisdiction." *Id*. "Under the theory of general jurisdiction, a court may hear a lawsuit against a defendant who has continuous and systematic contacts with the forum state, even if the injuries at issue in the lawsuit did not arise out of the defendant's activities directed at the forum." *Id*. (internal quotation marks omitted). "In contrast, specific jurisdiction is viable only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state." *Id*. "Both theories

of personal jurisdiction require some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id*. (internal quotation marks omitted). "If a court determines that a defendant has minimum contacts with the forum state, it may then consider whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Id*. (internal quotation marks omitted).

The Eighth Circuit has "instructed courts to consider the following factors when resolving a personal jurisdiction inquiry: (1) the nature and quality of a defendant's contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interests of the forum state in providing a forum for its residents; and (5) the convenience of the parties." *Id*. at 1073-74 (internal quotation marks omitted). "Significant weight is given to the first three factors." *Id*. at 1074. In applying this test, the burden is on the plaintiff to prove sufficient facts to support a "reasonable inference that the defendants can be subjected to jurisdiction within the state." *Dever*, 380 F.3d at 1072 (internal quotation marks omitted). "The plaintiff's prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto." *Id*. at 1073 (internal quotation marks omitted).

Here, Horizon argues that the following facts are sufficient for this Court to exercise either specific or general personal jurisdiction: (1) UFG selected Horizon, a Minnesota corporation, as a supplier; (2) UFG intended to make Horizon its "long-term supplier"; (3) UFG directly negotiated with Horizon over the prices in some of its sales

contracts; (4) UFG entered into more than 500 sales contracts with Horizon over a three-year period and delivered $26.9 million in payments by check to Horizon in Minnesota; (5) UFG sent hundreds of communications by phone and email to Horizon in Minnesota; (6) UFG representatives have visited the offices of two other companies in Minnesota; and (7) Horizon "believes" that UFG purchases meat from two other Minnesota companies.[2] UFG contends that these facts are insufficient for this Court to exercise specific personal jurisdiction over a corporation that never physically entered Minnesota in connection with its relationship with Horizon, and insufficient to exercise general personal jurisdiction over a corporation that did not otherwise maintain a meaningful presence in Minnesota.

As an initial matter, as UFG notes, the Eighth Circuit has indicated that "[c]ontact by phone or mail is insufficient to justify exercise of personal jurisdiction under the due process clause." *Porter v. Berall*, 293 F.3d 1073, 1076 (8th Cir. 2002); *see also Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 966 F. Supp. 833, 837 (D. Minn. 1997) ("Correspondence such as letters, facsimiles, and telephone conversations alone do not establish personal jurisdiction."). The Eighth Circuit has also added that "[m]erely entering into a contract with a forum resident does not provide the requisite contacts between a defendant and the forum state." *Iowa Elec. Light & Power Co. v. Atlas Corp.*, 603 F.2d 1301, 1303 (8th Cir. 1979). In short, neither mere email or telephone contacts

---

[2] The sixth and seventh facts cited by Horizon are unrelated to underlying dispute in this case, and thus could only be relevant to the question of general personal jurisdiction. Because the Court determines that the facts in this case satisfy the requirements for specific personal jurisdiction, for the reasons given below, the Court need not discuss these sixth and seventh facts any further.

alone nor the mere presence of a contract between diverse parties alone is ordinarily enough for a federal district court to exercise personal jurisdiction over an out-of-state defendant.

However, those general principles do not preclude an exercise of personal jurisdiction where such contacts – in combination, or along with any additional indicia of engagement with a disputed forum – demonstrate a "substantial connection" with a forum state, *Digi-Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996) (internal quotation marks omitted), even if the defendant never physically enters the jurisdiction. As the Supreme Court explained in *Burger King Corporation v. Rudzewicz*, 471 U.S. 462, 476 (1985):

> Jurisdiction . . . may not be avoided merely because the defendant did not physically enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*See also Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1433 (8th Cir. 1995) (explaining that mail and telephone contacts – and presumably email contacts as well – "remain a consideration in determining whether the defendant purposefully availed [it]self of the privilege of doing business in Minnesota"). The Court adds that the technological changes noted by the Supreme Court in *Burger King* have only accelerated since that 1985 decision, and that the ubiquitous role of the internet in

modern business further underscores the need for courts to consider practical realities in applying the "minimum contacts" standard. In accordance with that background, in at least one prior case in the District of Minnesota the court found that it had specific personal jurisdiction over a corporation that had a business relationship with a Minnesota company, but failed to physically enter the state in connection with that relationship. *See K-Tel Int'l, Inc. v. Tristar Prods., Inc*., 169 F. Supp. 2d 1033 (D. Minn. 2001). There, the court noted that the defendant corporation had (1) faxed a signed contract to a corporation in Minnesota; (2) received wire transfers from the Minnesota corporation; (3) engaged in frequent communications with the Minnesota corporation; and (4) had named the Minnesota corporation as an "additional insured" on its insurance policy. *Id*. at 1041.

Here, the Court concludes that the facts of this case demonstrate at least as substantial a connection between UFG and this forum as the facts in *K-Tel*, and are sufficient to supply the minimum contacts necessary for this Court to exercise specific personal jurisdiction over UFG. As an initial matter, as explained above, Horizon's affidavits indicate that it made 530 separate sales to UFG between 2005 and 2008, worth a total of nearly $27 million. This consistent, extensive relationship also produced the 127 contracts that are the subject of this action, which were worth another $9 million. In short, it is clear that UFG's contacts with Minnesota were neither "random" nor "attenuated." *See K-Tel Int'l, Inc.*, 169 F. Supp. 2d at 1041. Rather, UFG developed a substantial tie to a Minnesota company, and incurred obligations to that company that entailed the routing of tens of millions of dollars through Minnesota's economy.

Obligations of that magnitude strongly implicate Minnesota's interests in providing a forum for resident corporations.

The Court adds that while a significant portion of the negotiations that gave rise to the parties' contracts appear to have been routed through Stewart-Miller – including, according to UFG, all of the preliminary negotiations related to the transactions at issue here – Stewart-Miller was not a party to the final sales contracts. Rather, Horizon avers that it sent the relevant sales confirmations directly to UFG; sent its bills directly to UFG; and that UFG delivered its payments by check to Horizon in Minnesota. This means that while most of the relevant negotiations were not conducted directly between the parties, the core contacts that formally finalized the parties' contracts – and created UFG's considerable obligations – **were** direct, and were transmitted either to or from Minnesota. Finally, the hundreds of email and phone communications alleged by Horizon – while not sufficient to confer jurisdiction on their own – tend to further demonstrate that this is not a case involving mere attenuated involvement between the defendant and the forum state.

In sum, UFG had a longstanding, significant relationship with a Minnesota business – evidenced by hundreds of separate sales contracts and hundreds of separate communications, and contractual obligations totaling more than $25 million – and modern technology simply made actual visits to Minnesota unnecessary. In the course of developing that relationship, it should have been reasonably apparent to UFG that if a dispute arose out of this steady, significant engagement with Minnesota's economy, UFG may be hailed into Minnesota's courts. This Court is presented with such a dispute here, and the Court finds nothing that would offend "fair play and substantial justice" in this

Court's exercise of specific personal jurisdiction. *Dever*, 380 F.3d at 1073. Accordingly, UFG's motion to dismiss is denied to the extent that it challenges this Court's personal jurisdiction.

## II. VENUE

UFG also argues that this case should be dismissed because the District of Minnesota is an improper venue. The general federal venue statute states:

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). A corporate defendant is deemed to "reside" pursuant to subdivision (1) in "any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c). Because this Court has personal jurisdiction over UFG for the reasons given above, UFG is deemed to "reside" in Minnesota, and the federal venue statute is satisfied. Accordingly, UFG's motion to dismiss is denied to the extent that it contends that the District of Minnesota is an improper venue.

## III. REQUEST TO TRANSFER

Finally, UFG asks that this case be transferred to the Central District of California. "For the convenience of the parties and witnesses, in the interest of justice, a district court

may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). In considering a motion to transfer under § 1404(a), Courts weigh "(1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice." *Terra Int'l, Inc. v. Miss. Chem. Co.*, 119 F.3d 688, 691 (8th Cir. 1997). A court's considerations, however, are not limited to these enumerated factors. *Id*. "Instead, courts have recognized that such determinations require a case-by-case evaluation of the particular circumstances at hand and consideration of all relevant factors." *Id*. The moving party, however, must show that the relevant considerations "strongly favor[]" transfer. *Brockman v. Sun Valley Resorts, Inc.*, 923 F. Supp. 1176, 1179 (D. Minn. 1996).

Here, UFG acknowledges that neither state is substantially more convenient for the parties because whether the case is held in Minnesota or in California, one of the parties will have to travel. UFG argues, however, that many of the non-party witnesses are located in California, where many of the critical events in the case occurred, tilting the balance in favor of shifting the trial there.

The Court concludes that this is not a sufficient basis to transfer this case to California. While UFG may be correct that this venue will create some difficulty for California witnesses, UFG has indicated in an affidavit that it may also call witnesses from Michigan and Pennsylvania. (Karp. Decl., Docket No. 9, ¶ 17.) For those witnesses, California would clearly be a less convenient forum than Minnesota. In addition, while at least some of the facts related to the disputed deliveries will relate to events occurring in California, it is unclear at this stage of the case whether the central

dispute will be over what actually occurred in connection with those deliveries, or whether it will instead focus on the nature of the parties' contractual obligations and their course of dealing, which are not as obviously "located" anywhere. In short, UFG has not pointed to any facts that strongly favor transfer, and this Court finds no basis for overriding the "general presumption in favor of a plaintiff's choice of forum." *Nelson v. Soo Line R.R.*, 58 F. Supp. 2d 1023, 1026 (D. Minn. 1999). Accordingly, UFG's motion is denied to the extent that it requests that this case be transferred to the Central District of California.

## ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendant UFG's Motion to Dismiss [Docket No. 12] is **DENIED**.

DATED: July 23, 2009  
at Minneapolis, Minnesota.

                                                                               s/ John R. Tunheim  
                                                                                 JOHN R. TUNHEIM  
                                                                     United States District Judge