# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| NICOLLET CATTLE COMPANY, INC.<br>d/b/a Horizon International, | Civil No. 08-5899 (JRT/FLN) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED FOOD GROUP, LLC, | |
| Defendant. | |

Charles N. Nauen, David J. Zoll, and William A. Gengler, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401, for plaintiff.

Annamarie A. Daley and Aaron A. Myers, **BARNES & THORNBURG, LLP**, 100 South Fifth Street, Suite 1100, Minneapolis, MN 55402, for defendant.

Plaintiff Nicollet Cattle Company, which does business under the name Horizon International ("Horizon"), sells beef, lamb, and mutton products originating from several continents. Defendant United Food Group, LLC ("UFG"), has been one of Horizon's customers since 2005. After UFG cancelled 148 sales contracts worth more than $9 million in October 2008, Horizon filed this action against UFG alleging three contract claims under the Uniform Commercial Code ("UCC"). UFG now asks the Court to dismiss the case as a sanction for Horizon's intentional destruction of evidence and moves for summary judgment on the merits Horizon's claims. For the reasons set forth below, the Court denies UFG's motion.

## BACKGROUND

Horizon is a Minnesota corporation that sells beef, lamb, and mutton products from Australia, New Zealand, Uruguay, the United States, and Canada. (Goldberger Decl. ¶ 2, Docket No. 141.)   Horizon sells these products to importers, traders, distributors, and processors throughout the United States in "loads" containing approximately 42,000 pounds of frozen meat. (*Id.* ¶¶ 3-4.)

From 2005 through 2007, Horizon sold approximately 270 loads of meat worth $14.4 million to UFG. (UFG's Second Am. & Supplemental Answers to Certain of Horizon's First Set of Interrogs. at 3, Zoll Decl. Ex. 1, Docket No. 140.)   In 2008, Horizon became UFG's largest supplier of meat products. (Confidential Zoll Decl. ¶ 7 & Ex. 2, Docket No. 139.)   From May through July 2008, UFG placed a number of orders with Horizon, but repeatedly asked Horizon to delay delivery of some of those loads. (*See* Confidential Zoll Decl. ¶¶ 9-10 & Exs. 7-8 ("(1) . . . [UFG] placed a total of 147 orders for delivery in May 2008 and . . . only 88 of these orders were actually delivered in May; (2) . . . [UFG] placed a total of 148 orders for delivery in June 2008 and . . . only 80 of these orders were actually delivered in June; and (3) . . . [UFG] placed a total of 72 orders for delivery in July 2008 and . . . only 50 of these orders were delivered in July."); *see also* Daley Decl. Ex. C, Docket No. 133; UFG's Second Am. & Supplemental Answers to Certain of Horizon's First Set of Interrogs. at 5-6, Zoll Decl. Ex. 1, Docket No. 140.)   The delayed deliveries during those months created a backlog of unfilled purchase orders at the beginning of October 2008.

UFG asserts that at the beginning of October 2008 – and as purportedly confirmed in an October 14, 2008, email between the parties – UFG and Horizon agreed that Horizon would deliver to UFG fifteen loads per week throughout October and November 2008 until the outstanding purchase orders were filled.  (Daley Decl. Exs. A, G, Docket No. 133.)  UFG claims, however, that Horizon failed to deliver the requisite loads to UFG each week in October 2008.  (*Id.* Ex. F.)  On October 21, 2008, UFG made a written request to Horizon asking for assurance of performance, which UFG contends Horizon did not provide.  (*Id.* Ex. D.)  Horizon argues that there is a fact dispute about whether it provided commercially adequate assurances of performance.

On October 30, 2008, UFG cancelled approximately 148 outstanding purchase orders, (UFG's Second Am. & Supplemental Answers to Certain of Horizon's First Set of Interrogs. at 13-16, Zoll Decl. Ex. 1, Docket No. 140), claiming that Horizon failed to timely deliver sixty loads of meat – or fifteen loads each week – prior to October 30.  (*Id.* at 13; Daley Decl. Ex. E, Docket No. 133.)  UFG also contends that the delivered orders had "paperwork problems," i.e., the loads were not accompanied by paperwork certifying that the meat was not contaminated with *e. coli.*  (Goldberger Decl. ¶¶ 38-42, Docket No. 16.)[1]

---

[1]   Horizon argues that UFG's purported reasons for cancelling the outstanding purchase orders were pretextual.  Horizon states the UFG was actually motivated to cancel the purchase orders because "the market price for imported beef products was falling and [UFG] stood to realize substantial savings by cancelling the orders and replacing the beef at lower prices." (Mem. in Opp'n to Mot. for Summ. J. at 3, Docket No. 138.)  Beginning in January 2008, prices for imported beef products increased steadily before peaking in mid-July 2008.  (Stewart Dep. Tr. at 212:8 – 215:9, Zoll Decl. Ex. 2 & Ex.3, Docket No. 140.)  After the mid-July peak,

(Footnote continued on next page.)

Horizon brought this action on November 3, 2008, alleging three contract claims under the UCC (as adopted under Minnesota law). Horizon contends that UFG improperly repudiated the sales contracts and seeks damages for its losses. (Compl. ¶¶ 19-26, Docket No. 1.) On May 3, 2010, UFG moved for dismissal as a sanction for spoliation of evidence and for summary judgment.

## DISCUSSION

UFG seeks dismissal of the case with prejudice as a sanction for Horizon's intentional destruction of documents relating to Horizon's tracking of overseas orders of meat and its long and short meat positions. UFG also contends that it is entitled to summary judgment because there is no fact dispute that Horizon beached the October 2008 agreement to deliver to UFG fifteen loads of meat per week during October and November 2008. The Court turns first to UFG's spoliation argument and then addresses UFG's motion for summary judgment on the merits.

---

(Footnote continued.)

imported beef prices began a precipitous decline that continued over the next four months, dipping to the lowest levels of the year. (*Id.*) Horizon contends that the drop in market prices for imported beef presented problems for UFG because "[i]t had entered into numerous sales contracts while the market price was climbing and, once the bubble burst, [UFG] was required to purchase the meat at prices substantially above the then-current market price." (Mem. in Opp'n to Mot. for Summ. J. at 3, Docket No. 138.) Horizon argues that by cancelling orders for purchase of imported beef at high prices and replacing those with orders for beef at the lower prices available in the latter months of 2008, UFG was able to realize substantial cost savings.

## I.      SPOLIATION

### A.      Background

#### 1.      Horizon's Blue and Manila Folder Tracking System

To organize documents pertaining to its purchases and sales of meat, Horizon employed a system that uses blue- and manila-colored folders.  (Goldberger Decl. ¶¶ 6-7, Docket No. 141; Goldberger Dep. Tr. at 103:24-07:12, Zoll Decl. Ex. 15, Docket No. 140.)  Horizon employee Jay Goldberger kept documents related to Horizon's orders from its meat suppliers, including purchase orders, health certificates, and customs information, in manila folders.  (Goldberger Dep. Tr. at 104:17-22, Zoll Decl. Ex. 15, Docket No. 140.)  Goldberger kept information about Horizon's outstanding sales to its customers, including purchase orders, invoices, and health certificates, in blue folders. (Goldberger Decl. ¶ 6, Docket No. 141.)   Approximately once a week, Goldberger "match[ed] outstanding purchases with outstanding sales and place[d] the manila folder for the specific load of meat inside the blue folder for the specific sale to which it would be applied."  (*Id.*)  Goldberger matched outstanding sales and purchases "based on timing" of when outstanding sales were due and when outstanding purchases were expected.  (Goldberger Dep. Tr. at 106:3-5, Zoll Decl. Ex. 15, Docket No. 140.) Goldberger kept the combined folders in a separate drawer until the transactions were completed and then archived the files.  (Goldberger Decl. ¶ 6, Docket No. 141.)

After UFG cancelled its orders with Horizon, Goldberger switched the manila folders containing information about the meat orders that Horizon had applied to its sales to UFG, with the blue folders containing information about UFG's cancelled orders.  (*Id.*

¶ 7.) That is, Goldberger placed the blue folders inside the manila folders.  Goldberger did this "in order to maintain the connection between the cancelled orders and the products which had been applied to the orders." (*Id*.)  When Horizon resold to other customers the meat that Horizon had originally assigned to UFG, Goldberger placed the combined folders into new blue folders corresponding to the other customers. (*Id*.)  According to Goldberger, this method allowed him to "track how each load of meat which had been applied to an order cancelled by [UFG] had been resold." (*Id*.)  On February 3, 2010, Horizon provided UFG with copies of the contents of the blue and manila file folders for use in this litigation.  (Zoll Decl. ¶ 17, Docket No. 140.)

### 2.    Horizon's Vessel Book

Horizon maintains vessel books to track loads of meat ordered from overseas suppliers.  (Goldberger Dep. Tr. at 201:16-21, Zoll Decl. Ex. 15, Docket No. 140-2.)  The vessel books contain separate pages for each vessel that is carrying Horizon's outstanding orders to the United States. (*Id*. at 202:20-22.)  When Goldberger received an arrival notice indicating that an order had arrived, he would "check it off to make sure that here's the load, here's the container and it's definitely on that vessel." (*Id*. at 202:10-19.)

Goldberger testified that Horizon had created a partial vessel book for 2008, and that in the ordinary course of business, Horizon "clean[ed] it up [i.e., discarded vessel pages], as . . . the vessels [we]re finished." (Goldberger Dep. Tr. at 330:9-17, Confidential Zoll Decl. Ex. 17, Docket No. 139.)  Goldberger testified that after UFG cancelled its orders, Horizon stopped updating the vessel book.  (Goldberger Dep. Tr. at

201:25-202:1, Zoll Decl. Ex. 15, Docket No. 140.)  He explained: "there was just no time to do [the vessel book] during [the] period . . . after UFG cancelled the orders . . . [Horizon did] what needed to get done for the day just to keep things going." (*Id.* at 202:4-9.)  The Court notes, however, that the record includes a vessel schedule identifying 137 loads of meat that Horizon assigned to UFG.  Horizon provided the schedule to UFG on October 9, 2008.  (Vessel Schedule, Confidential Zoll Decl. Ex. 16, Docket No. 139.)

### 3.    Horizon's Long and Short Market Positions

Regarding Horizon's short and long market positions, Goldberger testified that sometimes Horizon "went short," meaning it would sometimes sell meat to its customers that it had not yet ordered from its suppliers.  (Goldberger Dep. Tr. at 110:8-12, Zoll Decl. Ex. 15, Docket No. 140.)  Whether Horizon would order meat "depend[ed] on [Goldberger's] feeling on the market." (*Id.* at 109:5-19.)  Goldberger testified that Horizon sometimes filled UFG's orders with meat Horizon had bought on the open market, and at other times filled UFG's orders with meat that Horizon originally intended to fill another customer's order.  (*Id.* at 194:6-24.)

### 4.    UFG's Motion to Compel

On December 22, 2009, UFG filed a motion to compel Horizon to produce various documents that Horizon kept in the ordinary course of its business, including "vessel sheets" from the vessel books, and documents relating to its long and short market positions.  (Mot. to Compel at 2, Docket No. 47.)  On February 18, 2010, United States

Magistrate Judge Franklin Noel ordered Horizon to produce the vessel sheets generated between January 1, 2008, and December 31, 2008, and reports documenting Horizon's long and short meat positions.   (Order, Docket No. 82.)   Horizon has stated that it discarded the vessel sheets in the ordinary course of business, (*see* Daly Decl. ¶ 10, Docket No. 133), and that it did not formally track its long and short market positions, (*see* Goldberger Dep. Tr. at 110:17-25, 145:10 – 146:5, Zoll Decl. Ex. 15, Docket No. 140).

### B.      UFG Has Not Established Spoliation.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (internal quotation marks omitted).   To establish spoliation, the moving party must show that the adverse party destroyed potential evidence, that the evidence was discoverable, and that the loss of evidence prejudiced the moving party.   *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 954 (D. Minn. 1999).

"The obligation to preserve evidence begins when a party knows or should have known that the evidence is relevant to future or current litigation."  *E\*Trade Secs. LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 588 (D. Minn. 2005).   The Court must first determine when the "defendant's duty to preserve evidence was triggered."  *Id.*   If potential evidence is destroyed prior to the commencement of litigation pursuant to a document retention policy, the moving party must also show that the destruction was

intentional and in bad faith.  *Id.*  "If, however, the destruction of evidence occurs after litigation is imminent or has begun, no bad faith need be shown by the moving party." *Id.* at 589.

Upon a showing of spoliation, a court may impose appropriate sanctions. *Zubulake*, 220 F.R.D. at 216 ("The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." (alteration and internal quotation marks omitted)).  A court may only dismiss a case, however, if the movant establishes that there is a willful violation of an order for discovery and that the movant was prejudiced.  *Keefer v. Provident Life & Accident Ins. Co.*, 238 F.3d 937, 940 (8th Cir. 2000).

### 1.   Long and Short Market Positions

Horizon contends that it did not formally track its long or short positions and therefore could not have destroyed documents reporting that information.  UFG has not adduced evidence that Horizon maintained discoverable documentation of its long and short positions and, as a result, Horizon's alleged destruction of those documents cannot form the basis for UFG's spoliation claims.

### 2.   Vessel Books

Horizon does not dispute that it destroyed the vessel books in the ordinary course of its business or that the relevant vessel sheets would have been discoverable if Horizon had not already destroyed them prior to the commencement of this litigation.  UFG has not submitted evidence, however, suggesting that Horizon destroyed the vessel books

after UFG commenced this litigation or that Horizon destroyed the vessel books in willful violation of the Magistrate Judge's order compelling Horizon to produce the vessel books. Dismissal of the case is therefore not appropriate. *See Keefer*, 238 F.3d at 940.

UFG has also not adduced evidence that Horizon knew or should have known that litigation was imminent and that Horizon therefore had a duty to preserve the vessel books. Further, UFG has not demonstrated that Horizon destroyed the vessel books in bad faith, or that the loss of the vessel books prejudices UFG.

### a.      Bad Faith

Because there is no evidence that Horizon destroyed the vessel books after the litigation began or that Horizon should have been aware that this litigation was imminent, UFG must demonstrate that Horizon destroyed the vessel books in bad faith. *See E*Trade*, 230 F.R.D. at 588. "Bad faith need not directly be shown but can be implied by the party's behavior." *Id.* A party's behavior may suggest bad faith where the party "selectively preserve[d] some evidence while failing to retain other [evidence]." *Id.* To determine whether sanctions are warranted where a party has destroyed documents prior to litigation pursuant to a document retention policy, the Court considers "(1) whether the retention policy is reasonable considering the facts and circumstances surrounding those documents, (2) whether lawsuits or complaints have been filed frequently concerning the type of records at issue, and (3) whether the document retention policy was instituted in bad faith." *Id.* at 588-89.

UFG argues that the fact that "Horizon chose to destroy [the vessel books] and not the [blue and manila folders]" demonstrates that Horizon acted in bad faith. (Reply at 8-9, Docket No. 143.)   UFG cites Goldberger's testimony that Horizon did not maintain the vessel books after UFG cancelled its orders as evidence that "Horizon's record-keeping was done with specific awareness of issues with [UFG]." (*Id.* at 9 n.10.)  But Horizon's failure to **maintain** vessel books **after** UFG's cancellation of the purchase orders is not relevant when considering whether Horizon intentionally destroyed vessel books.  The record indicates that Horizon failed to maintain its vessel book because Horizon was distracted by its financial problems caused by the UFG's cancellation, not because Horizon wished to conceal evidence.  UFG adduces no other evidence that Horizon's destruction of the vessel books was in bad faith.

To the extent that Horizon has a "document retention policy" of discarding vessel sheets after a shipment arrives in the United States, UFG has not produced evidence indicating that such policy was unreasonable under the circumstances, that other lawsuits have been filed concerning the vessel books, or that Horizon instituted that policy in bad faith.

### b.      Prejudice

To the extent that the Court could conclude that Horizon destroyed the vessel books in bad faith, UFG must also show that the loss of evidence prejudiced its case. *See Keefer*, 238 F.3d at 940.   UFG argues that it needs the vessel books to challenge Horizon's assertion that Horizon had purchased meat to fill UFG's orders.  (Mem. of Law

in Supp. of UFG's Mot. for Summ. J. at 5, Docket No. 132.)  UFG contends that there is

no evidence that Horizon actually purchased and allocated meat to fill UFG's October

2008 or November 2008 orders.  (Reply at 7, Docket No. 143.)

     The Court finds that UFG has not shown that the destruction of the vessel books is

prejudicial to its case or to its assessment of damages.  Horizon adduced evidence that it

is customary for Horizon and others in the industry to assign incoming loads of meat to

one customer, and then to later reassign the same load of meat to a different customer

based on demand and other logistics.  (*See* Isenmann Dep. Tr. at 79:19 – 80:9, 97:15 –

98:3, Zoll Decl. Ex. 6, Docket No. 140; Goldberger Dep. Tr. at 194:6 – 24, Zoll Decl.

Ex. 6, Docket No. 140.)  Thus, it is uncertain whether the vessel books would have

indicated that Horizon did not initially assign or have enough loads of meat to fill UFG's

orders.  Regardless, such evidence would not necessarily lead to the conclusion that

Horizon was unable to meet UFG's delivery requests.

     Moreover, there is no prejudice when the movant is able to obtain the information

in the destroyed evidence elsewhere.  *See Fakhro v. Mayo Clinic Rochester*, No. 02-626,

2004 WL 909740, at *4 (D. Minn. Mar. 31, 2004).  UFG argues that Horizon's blue and

manila folders cannot provide the same information that was in the destroyed vessel

books because the folders were "subject to Horizon's physical alterations."  (Reply at 7

n.7, Docket No. 143.)  UFG speculates that the information in the folders is inaccurate

and that Horizon manipulated that information, but points to no evidence suggesting that

Horizon manipulated the contents of the folders it produced during discovery or that there

is any difference between the information in the folders and the information that had been in the vessel books.

Because UFG has failed to show that Horizon's destruction of the vessel books was in bad faith or that the destruction prejudiced UFG, the Court denies UFG's request for sanctions.[2]

## II.   SUMMARY JUDGMENT

### A.   Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[2] To the extent that UFG could demonstrate spoliation of the vessel books, the Court would regardless deny UFG's request for sanctions as untimely.  The motion for sanctions is non-dispositive, *see Ngo v. Storlie*, No. 03-3376, 2006 WL 1046933, at *1 n.1 (D. Minn. Apr. 19, 2006), and it is untimely under the Pretrial Schedule, which requires the parties to file all non-dispositive motions by March 1, 2010.  (*See* Order at 2, Docket No. 38.)

**B.    The Purported October 2008 Agreement**

The issues before the Court on summary judgment are (1) whether Horizon and UFG entered into an agreement at the beginning of October 2008 pursuant to which Horizon would deliver to UFG fifteen loads of meat per week beginning the first week of October 2008 and continuing through November 2008; and (2) whether Horizon breached that agreement by failing to timely deliver fifteen loads of meat each week in October.  (*Cf.* Mem. in Supp. of Mot. for Summ. J. at 5, Docket No. 132 ("The sales at issue in this matter all specified delivery dates and the parties had agreed that 15 loads of meat were to be delivered weekly beginning the first week of October 2008.  It is undisputed that Horizon failed to make delivery by those dates.").)

**1.    Substance of the October 2008 Agreement and Breach**

Asserting "uncontroverted facts," UFG states that "On October 14, 2008, Horizon confirmed that the parties had agreed, two weeks before, that it would deliver 15 loads per week to [UFG]. . . . [and] Horizon did not deliver 15 loads to UFG during each week in October."  (Mem. in Supp. of Mot. for Summ. J. at 1-2, Docket No. 132.)  To establish that Horizon breached an agreement to deliver fifteen loads per week beginning the first week of October 2008, UFG must prove (1) the formation of the agreement; (2) performance by UFG of any conditions precedent; and (3) breach of the agreement by Horizon. *See Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006) (citing *Indus. Rubber Applicators, Inc. v. Eaton Metal Prods. Co.*, 171 N.W.2d 728, 731 (Minn. 1969)).  Horizon contends that there are genuine issues of

material fact regarding the formation of the October 2008 agreement and whether Horizon breached that agreement.  The Court agrees.

First, there is a fact dispute regarding whether Horizon and UFG entered into an agreement in October 2008.  The portions of the record that UFG cites in support of the argument that Horizon and UFG entered into an agreement in October do not specifically mention an agreement between Horizon and UFG.  The October 14, 2008, email from Jay Goldberger at Horizon to David Karp at UFG stated, "I am attaching a list showing when you received the loads I sent that would be ready the week of October 6th and the week of October 13th. . . . 2 weeks ago when I asked Don [Stewart] . . . he said 'David [Karp] says he will need all orders filled spread through October/ fh [sic] November."  (Daley Decl. Ex. G, Docket No. 133.)   UFG focuses on the language that the orders were to be "spread" through October and November of 2008, but the email does not necessarily support the proposition that the orders were to be spread "evenly" throughout those two months—equating to fifteen loads per week.

UFG also cites the deposition of Jay Goldberger, Horizon's Rule 30(b)(6) designee, but Goldberger's testimony does not conclusively demonstrate that the parties formed a fifteen-load-per-week agreement beginning in the first week of October:

> Q.    Do you also recall seeing the e-mail exchange between you and Mr. Karp regarding 15 loads a week for October – with reference to October 2008?
>
> A.    Not specifically, but I could review it I'm sure.  I think I know which e-mail, I just don't remember the exact words.
>
> Q.    Well do you understand that Horizon had agreed to deliver 15 loads a week to United Food Group?

[objection]

A.      In what timeframe?

Q.      In October 2008.

A.      Yes, and we were prepared to do so.

(Goldberger Dep. Tr. at 255:3-15, Daley Decl. Ex. A, Docket No. 133.)  Later in his

deposition, however, Goldberger testified that "I don't believe we were asked to deliver

15 loads in the first week of October.  **I believe it was the third and fourth** [weeks]."

(*Id.* at 256:11-14 (emphasis added).)  David Karp, a UFG employee, also noted that

"[t]here is no overarching contract that created or governed an ongoing business

relationship between UFG and Horizon.  Each of UFG's orders was a separate and

fungible transaction and Horizon's obligation to UFG concluded upon the delivery of the

meat to UFG in California."  (Karp Decl. ¶ 7, Zoll Decl. Ex. 13, Docket No. 140.)

Giving Horizon, the non-movant, the benefit of all reasonable inferences, a reasonable

trier of fact could find that the parties did not form the purported October 2008

agreement.

Second, there is a fact dispute regarding whether Horizon breached any such

agreement.  Horizon concedes that it did not deliver to UFG fifteen loads during the week

of October 20, 2008, but Horizon asserts that UFG "consented to the delivery of fewer

than 15 loads of meat during" that week.  (Req. for Admis. at 2, Daley Decl. Ex. F,

Docket No. 133.)  Further, Horizon asserts that when Horizon attempted to deliver loads

to UFG during the week of October 27, 2008, UFG rejected the loads due to paperwork

problems without giving Horizon the opportunity to cure the problems, or rejected the loads in circumstances where UFG was responsible for the errors (e.g., problems with bills of lading).  (Steward Dep. Tr. at 208:10 – 210:2, Zoll Decl. Ex. 2, Docket No. 140.) "Generally, contract performance is excused when it is hindered or rendered impossible by the other party." *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984). Horizon argues that UFG hindered Horizon's performance by rejecting the shipments and denying Horizon the opportunity to correct the alleged paperwork problems, and by rejecting loads when UFG caused the paperwork problems.  In these circumstances, breach is a question of fact for the jury.  *See LaSociete Generale Immobiliere v. Minneapolis Cmty. Dev. Agency*, 44 F.3d 629, 638 (8th Cir. 1994) ("Minnesota law . . . provides that there must be a causal link between the alleged breach and the party's claimed damages.  Causation is a question of fact[.]" (citation omitted)).

In sum, a reasonable trier of fact could find that Horizon and UFG did not enter into the purported October 2008 agreement and, in the alternative, that Horizon did not breach that agreement because UFG hindered Horizon's ability to perform under the terms of the agreement, thereby excusing Horizon's non-performance.  Accordingly, the Court denies UFG's motion to the extent that it addresses formation and breach.

### 2.    UFG's Request for Reasonable Assurances

The Court also denies UFG's motion for summary judgment as it relates to UFG's request for reasonable assurances from Horizon.  On October 21, 2008, Karp sent an email to Goldberger at Horizon stating, "I need to know, with confidence, how many of

our outstanding loads will be available for us to get throughout next week.  I need to know today." (Daley Decl. Ex. D, Docket No. 133.)  Goldberger replied, "[W]e are also working on number of loads in [O]akland but do not want to commit until.  The customer let's me have it we will advise on those first thing." (*Id.*)  UFG argues that this email exchange demonstrates that UFG requested in writing that Horizon give assurances of performance, and that Horizon failed to provide those assurances.  (Mem. in Supp. of Mot. for Summ. J. at 2, Docket No. 132.)

UCC Section 2-609, as adopted in Minnesota, governs UFG's claim regarding adequate assurances.  Minnesota Statute §336.2-609 provides that if a party has "reasonable grounds for insecurity . . . with respect to the performance" of the other party, it "may in writing demand adequate assurance of due performance."  Minn. Stat. § 336.2-609(1).  If, as here, the contract is between merchants, "the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards." *Id.* § 336.2-609(2).  If a party fails to provide adequate assurances "within a reasonable time not exceeding 30 days" after receiving a justified demand, the party is considered to have repudiated the contract. *Id.* § 336.2-609(4).  Horizon argues that UFG has not demonstrated that it had commercially reasonable doubts regarding Horizon's performance and ignores the fact that Horizon responded to UFG's request for assurances.  The Court agrees.

First, the Court considers whether UFG had commercially reasonable doubts about Horizon's ability to deliver meat.  UFG concludes without citation to the record that it "reasonably believed that Horizon could not deliver meat in a timely manner." (Mem. in

Supp. of Mot. for Summ. J. at 9, Docket No. 132.)   In response to UFG's motion, Horizon adduced evidence showing that it repeatedly asked UFG if it was receiving adequate quantities of meat and asked UFG when it wanted Horizon to deliver delayed orders.   (*See, e.g.*, Stewart Dep. Tr. at 143:19 – 144:12, 164:6-23; Zoll Decl. Ex. 2, Docket No. 140; Daley Decl. Ex. G, Docket No. 133.)   On October 14, 2008, Horizon confirmed that UFG had requested that the outstanding orders be filled by the first half of November, but explained to UFG that some orders would not be delivered until November and December.   (Daley Decl. Ex. G, Docket No. 133.)   At that time, Horizon had already sent to UFG a "Vessel Schedule" listing the 137 loads of meat that had been assigned to the outstanding Horizon-UFG contracts and including the estimated arrival dates for those loads.   (Confidential Zoll Decl. Ex. 16, Docket No. 139.)

Horizon has adduced sufficient evidence such that a reasonable trier of fact could conclude that UFG did not have commercially reasonable doubts regarding Horizon's performance under the purchase orders.   *Cf. US Salt, Inc. v. Broken Arrow, Inc.*, Civ. No. 07-1988, 2008 WL 398818, at *4 (D. Minn. Feb. 11, 2008) (holding that by not providing any assurances in response to justified demand and by not taking any actions to perform under the contract, the defendant had breached the contract).   Therefore, summary judgment is not appropriate.

Second, there is a fact dispute about whether Horizon's assurances were adequate. As noted above, UFG states that the "uncontroverted facts" show that Horizon did not respond or provide adequate assurances to UFG.   UFG's description of the record, however, is incomplete.   After Goldberger responded to Karp's e-mail and stated, "[W]e

are also working on number of loads in [O]akland but do not want to commit until," Karp acknowledged Goldberger's response with a terse, "Got email."   (Daley Decl. Ex. D, Docket No. 133.)  On October 22, 2008, the day after the initial email exchange, Horizon informed UFG that for the week of October 27, Horizon would have ten loads of 95% lean bull, two loads of 90% lean shank, two loads of 90% lean cow, and six loads of SIBS for a total of twenty loads of meat.  (Zoll. Decl. Ex. 16, Docket No. 140.)  On October 23, 2008, Horizon advised UFG of the loads to be delivered and informed UFG that as "for the other 10 loads [it was] double and triple check[ing] with the freezers that they will guarantee the meat ready" for delivery.  (*Id.* Ex. 17.)

Viewing the facts in a light most favorable to Horizon, a reasonable trier of fact could find that Horizon's assurances were commercially adequate.   Accordingly, the Court denies UFG's motion for summary judgment as it relates to reasonable assurances.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that United Food Group, LLC's Motion for Summary Judgment [Docket No. 130] is **DENIED**.


DATED:  September 7, 2010                    s/ John H. Tunheim
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                              United States District Judge